IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00305-DDD

UNITED STATES OF AMERICA,

     Plaintiff,

v.

3.  JONATHAN K. YIOULOS,

     Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), through Assistant United States Attorneys Hetal J. Doshi and Andrea Surratt, and the defendant, Jonathan K. Yioulos, personally and by counsel, Michael Tallon, hereby submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1 and Fed.R.Crim.P.11(c)(1)(A) and (B).

## I.  AGREEMENT

*A.*    *Defendant's Obligations*

The defendant agrees to (1) plead guilty to Counts One and Thirty-Nine of the Indictment, charging a violation of 18 U.S.C. §§ 1349 and 1343, respectively; (2) waive his appeal rights, as detailed below; (3) pursuant to 18 U.S.C. § 3663(a)(3) be liable for restitution to N.A.C. in an amount to be determined at sentencing, but not less than $5,053,878.50, for which he could be jointly and severally liable with other co-conspirators; and (4) agree not to contest forfeiture of proceeds, as described fully below.

*B.*    *Government's Obligations*

In exchange for the defendant's plea of guilty and his waiver of appeal rights, the government agrees to the following: (1) to file no other federal criminal charges against the defendant based on

1

COURT EXHIBIT
1

matters currently known to the government; (2) recommend a sentence of imprisonment no greater than 63 months; (3) at the time of sentencing, move to dismiss Counts 2-38, and 40 as against YIOULOS only; and (4) recommend a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, provided that the defendant does not do anything that is inconsistent with accepting responsibility between and including the date of his guilty plea and the date of sentencing.

C.      *Defendant's Waiver of Appeal*

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined.  Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence, including the restitution order, unless it meets one of the following criteria: (1) the sentence exceeds the maximum sentence provided in the statutes of conviction, 18 U.S.C. § 1343 and 1349; (2) the sentence exceeds the advisory guideline range that applies to a total offense level of 26; or (3) the government appeals the sentence imposed.   If the first criteria applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence. But if one of the latter two criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence, including the restitution order, in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255).  This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing

2

guidelines or sentencing statute; (2) the defendant was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced by prosecutorial misconduct.

The defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number. The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that "extraordinary and compelling reasons" for a sentence reduction are lacking or that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a).

D.   *Defendant's Cooperation*

The defendant agrees to provide truthful, complete, and accurate information relating to any matter about which the defendant may possess knowledge, information, or materials being investigated by the government, and agrees to cooperate fully with the government. Lies, deliberate falsehoods or misleading information provided during the cooperation with the government would be grounds for rescission of this plea agreement as well as possible further prosecution for perjury or false statements. This cooperation will include, but is not limited to, the following:

1)   The defendant agrees to be fully debriefed, and to attend all meetings at which his presence is requested, concerning his participation in and knowledge of all criminal activities.

2)   The defendant agrees to affirmatively furnish to the government all documents and other material that may be relevant and that are in the defendant's possession or control.

3)   The defendant agrees to testify fully and truthfully at any proceeding in the District of Colorado or elsewhere as requested by the government.

3

4)      The defendant agrees to at all times give complete, truthful, and accurate information and testimony and to fully and truthfully disclose all information with respect to the activities of the defendant and others concerning all matters about which the government inquires.

5)      The defendant consents to postponements of his sentencing, as requested by the government and as approved by the Court. Should the defendant be required to provide testimony at a time subsequent to his sentencing in this case and should the defendant fail, at a later date, to comply with the obligation to testify, the government could seek to recharge him on any and all counts which were dismissed as part of this plea agreement.

6)      The defendant agrees he will not violate federal, state, or local law while awaiting sentencing in this case. The defendant further agrees to abide by all the terms and conditions of any bond executed in the defendant's case. The government may consider any such violations a material breach of his agreement to cooperate with the government.

The government agrees that any information and testimony given by the defendant pursuant to this agreement will not be used against him, either directly or indirectly, in any criminal case except for prosecutions for perjury, making a false statement, obstruction of justice, or for impeachment. Information and testimony will not be used against the defendant pursuant to Section 1B1.8 of the Sentencing Guidelines.  Any information and testimony relating to the defendant's involvement in

4

crimes of violence, as defined in Title 18, United States Code, Section 16, is excluded from this agreement.

The defendant agrees that if the government can show that he lied or attempted to mislead the government or law enforcement authorities, or if he does not fulfill the terms of or does not complete his cooperation under this agreement, then any information or testimony which he has given in connection with this case can be used in any prosecution against him, notwithstanding the provisions above. If the government alleges such conduct, it will have the burden of establishing the alleged conduct at a separate hearing by a preponderance of the evidence.

Provided that the defendant fully and truthfully cooperates with the government as described above, as determined in the government's sole discretion, the government may elect to file, but is not required to do so, before or at the time of the defendant's sentencing, a motion for downward departure, pursuant to Section 5K1.1 of the Sentencing Guidelines and Title 18, United States Code, Section 3553(e). The parties agree that the defendant shall not be entitled to withdraw his plea if the government determines that the defendant has not fully cooperated and provided substantial assistance.

E. *Forfeiture of Assets*

The defendant admits the forfeiture allegations. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to Title 18, United States Code, Sections 982(a)(1), 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), whether in the possession or control of the United States or in the possession or control of the defendant or defendant's nominees, or elsewhere. The assets to be forfeited specifically include, but are not limited to: a money judgment to be finalized at sentencing,

but in an amount not less than $5,053,878.50 which constitutes the amount of the proceeds obtained by the co-conspirators from the fraudulent invoice scheme described herein.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. The defendant admits and agrees that the conduct described in the Stipulation of Facts below provides a sufficient factual and statutory basis to establish that the requisite nexus exists between the specific property subject to forfeiture and the offenses to which defendant is pleading guilty. Pursuant to the provisions of Rule 32.2(b)(1), the United States and the defendant request that at the time of accepting this plea agreement, the Court find that the government has established the requisite nexus and enter a preliminary order of forfeiture. The defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control and those which are held or controlled by a nominee.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture. However, the United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from the sale of the judicially forfeited assets be remitted or restored to eligible victims of the offenses, for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws, if all statutory factors are met. The defendant understands that the United States Attorney's Office has authority only to recommend such relief and that the final decision of whether to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law.

The defendant agrees that the United States is not limited to forfeiture of the property described above. If the United States determines that property of the defendant identified for forfeiture cannot be located upon the exercise of due diligence, has been transferred or sold to, or

6

deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, then the United States shall be entitled to forfeiture of any other property (substitute assets) of the defendant up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e). This Court shall retain jurisdiction to settle any disputes arising from application of this clause. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

      G.     *Government's Reservation of Rights to Withdraw from the Plea Agreement*

The government may withdraw from the Plea Agreement up to the date of sentencing if all of the following four conditions are met: (1) the government receives information not known to the government as of the date of the Plea Agreement; (2) that new information concerns either (a) conduct engaged in by the defendant before the date of the Plea Agreement and related to the charges in the Indictment or (b) any conduct after the date of the Plea Agreement; (3) such conduct violates state or federal criminal law; and (4) at a hearing, the government proves this conduct by a preponderance of the evidence.

## II. **ELEMENTS OF THE OFFENSE**

The parties agree that the elements of the offenses to which this plea is being tendered are as follows:

### **Count One: 18 U.S.C. § 1349**

***First***: Two or more persons agreed to violate the law;

***Second***: The defendant knew the essential objectives of the conspiracy;

***Third***: The defendant knowingly and voluntarily participated in the conspiracy; and

***Fourth***: There was interdependence among the members of the conspiracy.

7

*United States v. Fishman*, 645 F.3d 1175, 1186 (10th Cir. 2011) (citing *United States v. Baldridge*, 559 F.3d 1126, 1136 (10th Cir. 2009).[1]

## Count Thirty-Nine:   18 U.S.C. § 1343

*First*:   The defendant devised or intended to devise a scheme to defraud, as alleged in the

indictment;

*Second*: The defendant acted with the specific intent to defraud;

*Third*:   The defendant used or caused another person to use interstate or foreign wire

communications for the purpose of carrying out the scheme; and

*Fourth*:   The scheme employed false or fraudulent pretenses, representations, or promises that were

material.

10th Cir. P.J.I. § 2.57 (2018).

## III.   STATUTORY MAXIMUM SENTENCE

The maximum statutory sentence for a violation of 18 U.S.C. § 1349 is not more than 20 years'

imprisonment, not more than a $250,000 fine or two times the amount of gain or loss, whichever is

---

[1] *But see United States v. Hammers,* 942 F.3d 1001 (10th Cir. 2019) (cert. denied) ("To prove conspiracy to embezzle federal program funds under 18 U.S.C. § 371, the Government must show: (1) Defendant's agreement with another person to violate the law; (2) his knowledge of the essential objective of the conspiracy; (3) his knowing and voluntary involvement; and (4) interdependence among co-conspirators. *United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000). To prove conspiracy to commit bank fraud under 18 U.S.C. § 1349, the Government must show: (1) Defendant agreed with at least one other person to commit bank fraud; (2) **one of the conspirators committed an overt act in furtherance of the conspiracy;** (3) Defendant knew the essential objective of the conspiracy; (4) Defendant knowingly and voluntarily participated in the conspiracy; and (5) there was interdependence among co-conspirators."). *Hammers* did not discuss, describe, or otherwise overrule *Fishman* which stands for the proposition that a Section 1349 charge does not require proof of an overt act, nor did it discuss or describe the removal of the element of an overt act for a charge pursuant to 18 U.S.C. § 371.

greater, or both imprisonment and a fine, not more than 3 years' supervised release, a $100 special assessment fee, and restitution.

The maximum statutory sentence for a violation of 18 U.S.C. § 1343 is not more than 20 years' imprisonment, not more than a $250,000 fine or two times the amount of money laundered, whichever is greater; or both imprisonment and a fine, not more than 3 years' supervised release, a $100 special assessment fee, and restitution.

If a term of probation or supervised release is imposed, any violation of the terms and/or conditions of supervision may result in an additional term of imprisonment.

## IV. COLLATERAL CONSEQUENCES

These felony convictions may cause the loss of civil rights including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V. STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree that the government's evidence would be as follows:

Between August 2018 and July 2020, JONATHAN K. YIOULOS conspired with MICHAEL AARON TEW and KIMBERLEY ANN TEW to engage in a complex scheme to defraud a Florida-based company, N.A.C., Inc. ("the Victim Company") of more than $5 million through the submission of fraudulent invoices that billed the Victim Company for services it never received. YIOULOS, at the request of and with the knowledge and assistance of MICHAEL AARON TEW and KIMBERLEY ANN TEW, processed these fraudulent invoices submitted in the names of what appeared to be six different entities and caused payments associated with or supported by the fraudulent invoices to be made by the Victim Company.

### *The Individuals and Entities Involved*

**JONATHAN K. YIOULOS**

YIOULOS is a resident of the State of New York and was, at some point prior to 2018, the Director of Finance for the Victim Company. At some point between 2018 and July 2020, YIOULOS's title changed to Controller for the Victim Company, but he continued to also perform his responsibilities as the Director of Finance. YIOULOS is a certified public accountant licensed in New York, and had direct knowledge about the inner workings of the Victim Company's finances and its financial processes, including how to minimize the number of approvals necessary to process an outgoing payment from the Victim Company's bank account(s). YIOULOS nevertheless caused or authorized payments from the Victim Company's bank account(s) to accounts controlled by or accessible to MICHAEL AARON TEW and KIMBERLEY ANN TEW or to third parties' accounts for the benefit of MICHAEL AARON TEW and KIMBERLEY TEW for services YIOULOS knew the Victim Company had not received.

10

YIOULOS communicated from New York with MICHAEL AARON TEW, who resided in Colorado during the time relevant to the Indictment.   For the time period relevant to the Indictment, YIOULOS knew that MICHAEL AARON TEW and KIMBERLEY ANN TEW resided in Colorado.   YIOULOS used or caused interstate wires to be used to engage in the scheme described in Counts 1 and 39 of the Indictment, and used or caused interstate wires to be used to authorize or process fraudulent payments from the Victim Company's bank in New York to bank accounts controlled by or accessible to MICHAEL AARON TEW and KIMBERLEY ANN TEW in Colorado.

YIOULOS personally financially benefitted from the conspiracy and the scheme to defraud, albeit in an amount substantially lower than MICHAEL AARON TEW and KIMBERLEY ANN TEW.   After this fraud was discovered by the Victim Company, it terminated YIOULOS's employment on or around July 7, 2020.

In the performance of his duties at the Victim Company, YIOULOS worked with MICHAEL AARON TEW while MICHAEL AARON TEW served as CFO of the Victim Company.

**The Victim Company**

The Victim Company, N.A.C., Inc., is a company headquartered in Florida with an office in New York.   The Victim Company operates in the United States and is affiliated with the company N.A.C. Group, Inc., d/b/a N.A., which operates as an airline, and provides freight forwarding solutions, to include by charter and airlift.   N.A.C. Holdings, Inc. ("NAC Holdings") is one of several affiliates of the Victim Company.

**Sand Hill, LLC ("Sand Hill")**

YIOULOS knew that the Victim Company paid MICHAEL AARON TEW for his CFO services through Sand Hill, LLC, a single-member LLC, an entity which maintained a bank account(s) in Colorado.   During the course of this fraud and after MICHAEL AARON TEW's contract with

11

the Victim Company had been terminated, some payments made pursuant to this fraud were made to account(s) held in the name of Sand Hill.  On automated clearinghouse (ACH) transaction payment documentation submitted by YIOULOS to execute these fraudulent payments to accounts controlled by or accessible to MICHAEL AARON TEW and KIMBERLEY ANN TEW, YIOULOS listed payee "SHI LLC," which was an abbreviation or acronym for Sand Hill.  This was done to create the false impression of another entity and thereby evade detection.

**H.S. CPAs LLC (HS CPAs), M.C.G., Inc. ("MCG"), 5530 J.D., LLC ("5530 JD") and P.M., Inc. ("PM")**

HS CPAs, MCG, 5530 JD, and PM may have been or purported to be real companies whose existence predated the scheme to defraud.  These four entities are operated by or otherwise affiliated with individuals who are contacts of MICHAEL AARON TEW and/or KIMBERLEY ANN TEW.  YIOULOS authorized or submitted payments by the Victim Company of fraudulent invoices submitted in the name of these four entities.

**Global Fuel Logistics, Inc. (GFL) and Aero Maintenance Resources (AMR)**

During the conspiracy and execution of the scheme to defraud, YIOULOS and MICHAEL AARON TEW discussed aligning the company names used to submit fraudulent invoices more closely with the business of the Victim Company to evade detection.  They also discussed the need to diversify entities to whom the payments appeared to be directed so that any single entity did not appear to receive significant payments, which could arouse suspicion internally or by auditors.  MICHAEL AARON TEW then began submitting fraudulent invoices in the name of GFL, and later, in the name of AMR, a purported "division" of GFL.  MICHAEL AARON TEW advised YIOULOS that he had taken measures to put multiple layers between himself and the creation and purported operation of these entities, to include listing an address of family members in Michigan as GFL's principal office

12

address and registering GFL in Wyoming.   YIOULOS knew that GFL and AMR had no legitimate business operations and invoices submitted to the Victim Company in their names were fraudulent.

### The Conspiracy and Scheme to Defraud

How the Conspiracy and Scheme to Defraud Began

In or around August 2018, MICHAEL AARON TEW began submitting fraudulent invoices to the Victim Company, which YIOULOS authorized and were ultimately paid by the Victim Company.   Initially, the dollar amounts for the invoices were relatively small, but over time, the amounts demanded by each fraudulent invoice grew substantially.   Between August 2018 and July 2020, as a result of this conspiracy to commit wire fraud and scheme to defraud, the Victim Company paid $5,053,878.50 either directly to accounts controlled by or accessible to MICHAEL AARON TEW and KIMBERLEY ANN TEW or to third parties for the benefit of MICHAEL AARON TEW and KIMBERLEY ANN TEW.   YIOULOS believed that MICHAEL AARON TEW and KIMBERLEY ANN TEW needed the payments, at least in part, to pay outstanding and ongoing family debts.

The Operation of the Conspiracy and Scheme to Defraud

Initially, the invoices were submitted by or on behalf of entities not previously used as vendors by the Victim Company and who performed functions unrelated to the conspiracy.   Over time, the invoices were submitted by shell company nominees GFL and AMR, which existed as vehicles to continue the fraud, evade detection, and conceal the source and destination of income.   The fraudulent invoices, which were often submitted in support of the payments after the fraudulent payments had been issued, were all approved by YIOULOS, and payments were largely made via ACH transactions, although some payments were tendered by wire transfer.   This was because YIOULOS knew that only a single authorization was required to approve an ACH transaction while wire transfers

required two authorizations from the Victim Company. The ACH transactions and wire transfers were executed through interstate wires from the Victim Company's account at Signature Bank in New York to bank accounts in Colorado and elsewhere.

MICHAEL AARON TEW told YIOULOS that he must continue making fraudulent payments or the prior fraudulent payments would be reported to the Victim Company's management which would result in YIOULOS's termination. YIOULOS, who initially had a friendly relationship with MICHAEL AARON TEW when the conspiracy and scheme to defraud began, agreed to continue to knowingly process fraudulent invoices as part of this conspiracy and scheme to defraud. In exchange, at various points in time during the conspiracy and scheme to defraud, MICHAEL AARON TEW and KIMBERLEY ANN TEW offered YIOULOS various items, to include Bitcoin, as compensation for his approval of fraudulent payments. Typically, YIOULOS received a couple or few Bitcoin from MICHAEL AARON TEW and/or KIMBERLEY ANN TEW, but then MICHAEL AARON TEW and/or KIMBERLEY ANN TEW would ask YIOULOS to send that Bitcoin back, and that cycle continued on multiple occasions between 2018 and July 2020. Overall, throughout the time period of the scheme, YIOULOS netted a few Bitcoin from or associated with MICHAEL AARON TEW and/or KIMBERLEY ANN TEW as compensation for his role in this conspiracy and scheme. YIOULOS then sold that Bitcoin that he netted for approximately $100,000. MICHAEL AARON TEW and KIMBERLEY ANN TEW provided YIOULOS no additional significant forms of compensation. YIOULOS also separately caused the Victim Company to make payments for services not actually rendered to the Victim Company to him, or a third party for his and the third-party's benefit. The amount of those additional payments is at least approximately $60,000.

YIOULOS typically communicated with MICHAEL AARON TEW about the conspiracy and scheme to defraud. There were also occasions where KIMBERLEY ANN TEW herself communicated with YIOULOS about the conspiracy and scheme to defraud, and also circumstances when YIOULOS was on the phone with MICHAEL AARON TEW and heard KIMBERLEY ANN TEW in the background. There were also occasions on which MICHAEL AARON TEW told YIOULOS he had discussed some element of the conspiracy and scheme to defraud with KIMBERLEY ANN TEW.

MICHAEL AARON TEW and, on some occasions, KIMBERLEY ANN TEW contacted YIOULOS to request, and sometimes, demand, money from the Victim Company. To accommodate these demands for payment, YIOULOS, often advised MICHAEL AARON TEW about the financial status of the Victim Company and/or its affiliates so that payments of the fraudulent invoices did not result in the Victim Company and/or its affiliates overdrawing their bank accounts. YIOULOS often made payments on the demanded amounts in installments or "progress payments." That is, YIOULOS authorized and approved multiple ACH transfers or wire transfers where each transfer was for an amount less than the total amount of an invoice to try to pay accounts controlled by or accessible to MICHAEL AARON TEW and KIMBERLEY ANN TEW with whatever money was available to the Victim Company or its affiliates at that time.

In many cases, YIOULOS authorized or processed fraudulent payments, including "progress payments," even before a fraudulent invoice had been submitted to the Victim Company to satisfy MICHAEL AARON TEW and KIMBERLEY ANN TEW's immediate demands for money. In those instances, YIOULOS and MICHAEL AARON TEW communicated about how MICHAEL AARON TEW needed to submit a fraudulent invoice after the payment was issued to ensure that there was sufficient documentation in the Victim Company's files to support the amounts paid and

thereby evade detection.   During the conspiracy, if YIOULOS deferred or delayed payment of the fraudulent invoices based on the financial status of the Victim Company or its affiliates, MICHAEL AARON TEW and/or KIMBERLEY AARON TEW sometimes pressured YIOULOS to induce him to issue fraudulent payments.

Over time, the co-conspirators used more sophisticated means to conceal the fraud.   For example, at the beginning of the scheme to defraud, the fraudulent invoices contained generic descriptions of services like consulting services or "service fee."   Over time and as a result of discussions between YIOULOS and MICHAEL AARON TEW about needing to itemize services that more closely aligned with the work of the Victim Company, those descriptions grew more specific. For example, fraudulent invoices submitted later in the conspiracy listed services like "Trailing Edge Flap[,]" "Replacement of Moisture Barrier over Kevlar (Labor Hours)[,]" and "A-330-200 (N819CA) Crew / Operations / Staff Training[.]"

YIOULOS, in coordination with MICHAEL AARON TEW, also took steps to ensure that ACH confirmations maintained and tracked by the Victim Company reflected a diversity of payees that were difficult to trace to him or to MICHAEL AARON TEW and KIMBERLEY ANN TEW. Those steps included ensuring that fraudulent payments were spread out over multiple entities, including shell nominees, and listing fictitious entities like "SHI LLC" rather than Sand Hill on an ACH confirmation, as Sand Hill was known to the Victim Company as associated with the then-terminated MICHAEL AARON TEW.   YIOULOS and MICHAEL AARON TEW discussed these measures as a way to avoid arousing suspicion and evading detection.

Summary of Fraudulent Payments by Entity Over Time

The below chart summarizes fraudulent payments made in connection with invoices submitted by or in the name of the six entities involved.   These payments were authorized and

16

approved by YIOULOS.  Payments pursuant to this fraud were sent from the Victim Bank's bank account in New York to various bank accounts controlled by or accessible to MICHAEL AARON TEW and KIMBERLEY TEW or, in the beginning of the fraud, to bank accounts controlled by or accessible to third party contacts of MICHAEL AARON TEW and/or KIMBERLEY ANN TEW for their benefit.

*Chart 1:  Summary of Invoices and Payments between August 2018 and June 2020*

| | 2018 | | | 2019 | | | | | 2020 | | | | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Qtr3* | Qtr4 | Total | Qtr1 | Qtr2 | Qtr3 | Qtr4 | Total | Qtr1 | Qtr2 | Qtr3 | Total | |
| **HS CPAs** 3 Invoices | $50,000.00 | | $50,000.00 | | | | | | | | | | $50,000.00 |
| **5530 JD** 6 Invoices | $75,000.00 | $30,000.00 | $105,000.00 | | | | | | | | | | $105,000.00 |
| **MCG** 5 Invoices | | $125,000.00 | $125,000.00 | | | | | | | | | | $125,000.00 |
| **PM** 21 Invoices | | $36,375.00 | $36,375.00 | $267,962.50 | $551,665.00 | $59,675.00 | | $879,302.50 | | | | | $915,677.50 |
| **Global Fuel Logistics** 14 Invoices | | | | | | $446,000.00 | | $446,000.00 | | $847,338.00 | $95,000.00 | $942,338.00 | $1,388,338.00 |
| **Aero Maintainance Resources** 26 Invoices | | | | | | $329,200.00 | $810,500.00 | $1,139,700.00 | $682,055.00 | $648,108.00 | | $1,330,163.00 | $2,469,863.00 |
| **Grand Total** | $125,000.00 | $191,375.00 | $316,375.00 | $267,962.50 | $551,665.00 | $834,875.00 | $810,500.00 | $2,465,002.50 | $682,055.00 | $1,495,446.00 | $95,000.00 | $2,272,501.00 | $5,053,878.50 |

*Qtr 1: January, February, March
Qtr 2: April, May, June
Qtr 3: July, August, September
Qtr 4: October, November December

On or around May 21, 2020, in furtherance of the scheme to defraud, YIOULOS authorized a partial or installment payment on a demand for money.  Specifically, he caused or executed an ACH transaction of $78,565.00, which reflected an interstate wire in furtherance of the scheme to defraud.  Pursuant to YIOULOS's direction, $78,565.00 was transferred out of the Victim Company's bank account ending in 5545 at Signature Bank in New York, and deposited into a Navy Federal Credit Union account ending in 5336, held in the name of "Michael Tew."  Fraudulent

invoices from GFL that justified or supported these payments arrived after the execution of the payment to support the payment in the Victim Company's books and records.

In late June 2020, as part of this conspiracy and scheme to defraud, YIOULOS received an additional demand for money. On July 2, 2020, an invoice dated July 1, 2020 in the name of GFL seeking $95,000 was sent via email from a purported "Jessica Thompson" at GFL to YIOULOS at his email address provided by the Victim Company. On July 2, 2020, YIOULOS approved and authorized an ACH transfer of $95,000 from the Victim Company's bank account in New York to an account controlled by or accessible to MICHAEL AARON TEW and KIMBERLEY ANN TEW. That amount was transferred on July 3, 2020.

The total amount paid by the Victim Company pursuant to the fraudulent invoice scheme is $5,053,878.50.

## VI.  **ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT**

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

A.     The base guideline is U.S.S.G. § 2B1.1(a)(1), with a base offense level of **7**.[2]

---

[2] There are two counts of conviction.  Pursuant to U.S.S.G. § 3D1.2(d), because the offense level is determined largely on the basis of the total amount of harm or loss and because the offense behavior was ongoing or continuous in nature, a conviction for 18 U.S.C. § 1349 (covered by U.S.S.G. § 2B1.1) groups with 18 U.S.C. § 1343.

B.      The following specific offense characteristic applies:

i.      An **18**-level increase pursuant to § 2B1.1(b)(1)(J) because the amount of loss exceeds $3.5 million but is less than $9.5 million.

ii.     A **2**-level increase pursuant to § 2B1.1(b)(10)(C) for use of sophisticated means.

iii.    Chapter 3 enhancements apply: namely, a **2**-level increase pursuant to § 3B1.3 for abuse of a position of trust or use of a special skill.

C.      The adjusted offense level is therefore **29**.

D.      <u>Acceptance of Responsibility</u>:   The parties agree that the defendant should receive a **3**-level adjustment for acceptance of responsibility.   The resulting offense level therefore is **26**.

E.      <u>Criminal History Category</u>:   The parties understand that the defendant's criminal history computation is tentative.   The criminal history category is determined by the Court based on the defendant's prior convictions.   Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be **I**.

F.      Assuming the criminal history facts known to the parties are correct, the career offender/criminal livelihood/armed career criminal adjustments would not apply.

G.      <u>Imprisonment</u>:   The advisory guideline range resulting from these calculations is **63-78 months** for criminal history category **I**.   However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level estimated above could conceivably result in a range from 63 months (bottom of Category I) to 150 months (top of Category VI).

In any case, the guideline range would not exceed the cumulative statutory maximums applicable to the counts of conviction.

19

H.    Fine:   Pursuant to guideline § 5E1.2, under the estimated offense level calculated above, the fine range for this offense would be **$25,000 to $10,107,757** (twice the amount of loss), plus applicable interest and penalties.

I.    Supervised Release:   Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is at least one year and no more than three years.

J.    Restitution:   Pursuant to 18 U.S.C. § 3663(a)(3), the defendant agrees that he is liable for restitution to the Victim Company in an amount to be determined at sentencing, but not less than $5,053,878.50, for which he could be jointly and severally liable with other co-conspirators.   The defendant agrees to pay restitution in an amount as calculated and ordered by the Court.

The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines.   Similarly, no estimate by the parties regarding the guideline range precludes the defendant from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory

guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.   ENTIRE AGREEMENT

This document states the parties' entire agreement and there are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied.   In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: __11/16/2021__

_____
Jonathan K. Yioulos
Defendant

Date: __11. 16. 2021__

_____
Michael Tallon
Attorney for Defendant

Date: __November 15, 2021__

_s/ Hetal J. Doshi_____
Hetal J. Doshi
Assistant U.S. Attorney

Date: __November 15, 2021__

_s/ Andrea Surratt_____
Andrea Surratt
Assistant U.S. Attorney